# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| PLIXER INTERNATIONAL, INC., | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | CIVIL NO. 2:16-CV-578-DBH |
| | ) | |
| SCRUTINIZER GMBH, | ) | |
| | ) | |
| DEFENDANT | ) | |

## ORDER ON MOTION TO DISMISS FOR LACK OF JURISDICTION

The issue here is whether a federal court in Maine has jurisdiction over a German company. The German company, named Scrutinizer GmbH, has no physical presence in the United States, but it offers cloud-based services from an interactive website that attracts customers from around the world, including the United States (and two customers from Maine). A Maine firm, Plixer International, Inc. owns the U.S. registered mark "Scrutinizer." Plixer has filed this lawsuit claiming that the German defendant is infringing its registered mark by operating an interactive website using the name "Scrutinizer," providing services similar to the plaintiff's, generating income from customers in the United States, confusing the public, and diluting and infringing the mark. Am. Compl. ¶¶ 14-18; Pl. Opp'n at 1, (ECF No. 14). The German defendant has moved to dismiss. I previously dismissed by agreement any general jurisdiction claim. Order on Pending Motions at 1 (ECF No. 20). I also permitted limited discovery on the plaintiff's specific jurisdiction claim with reference to what is sometimes

called the federal long-arm statute, Fed. R. Civ. P. 4(k)(2); <u>see</u> <u>United States v.</u> <u>Swiss Am. Bank, Ltd.</u>, 274 F.3d 610, 618 (1st Cir. 2001). <u>Id</u>. at 1-2. After that discovery and further briefing, I now **DENY** the defendant's motion to dismiss the complaint, concluding that upon a prima facie record, the federal long-arm statute provides specific jurisdiction. It is a close call, however, and worthy of appellate review since the First Circuit has not addressed the issue of personal jurisdiction based solely upon an interactive website that offers cloud-based services, and the Supreme Court has never addressed 4(k)(2). <u>See</u> <u>Sinochem</u> <u>Intern. Co. Ltd. v. Malaysia Intern Shipping Corp.</u>, 549 U.S. 422, 427 (2007) (mentioning 4(k)(2)'s role in case's procedural history but not discussing its application).

**FACTS**

Under the First Circuit's "prima facie review" standard for determining personal jurisdiction, I accept the specific facts that the plaintiff alleges so far as evidence supports them after preliminary discovery. I also accept the facts the defendant offers to the extent that they are uncontradicted. <u>See</u> <u>Cossaboon v.</u> <u>Maine Med. Ctr.</u>, 600 F.3d 25, 31 (1st Cir. 2010).

In its original legal memorandum resisting the defendant's motion to dismiss, the plaintiff offered the following facts to demonstrate that the German defendant purposefully availed itself of the Maine or United States market beyond the undisputed existence of the interactive website.

1. The defendant has two customers in Maine.
2. Its website is in English.
3. The website offers users the option to start a 14-day free trial.

4. The website says that the defendant's service is "Trusted by over 5000 projects and companies around the world."
5. The defendant uses websites based in the United States in connection with its business.

Pl. Opp'n. at 5-6. These assertions are supported by the evidence for purposes of this motion, with the clarification that the evidentiary support for #5 is that in providing its services, the defendant uses other data-tracking companies that use or may use servers located in the United States. <u>See</u> Exs. to Decl. of James G. Goggin, Esq. (ECF No. 15).

As a result of the permitted limited discovery, the plaintiff now adds the following:

6. Over 3-1/2 years, the defendant had 156 United States sales transactions totaling about €165,212.07 (c. $195,477.54) in about 60% of the states.[1]
7. In January 2017, the defendant filed an application for a U.S. trademark for "Scrutinizer."

Pl. Suppl. Mem. at 1-2 (ECF No. 26).

The defendant offers the following facts, and they are uncontested:

1. The defendant is not incorporated in Maine, does not aim its services at the Maine market, and has no employee contact in Maine. Def. Suppl. Mem. at 1-2 (ECF No. 27).
2. It does not direct advertising towards the United States. Def. Reply Mem. at 2 (ECF No. 17).
3. No employee of the defendant has ever been in the United States. <u>Id</u>.
4. It has no offices in the United States nor does it own property here. <u>Id</u>.

---

[1] The defendant's Answers to Interrogatories show two customers in Maine for €3100, and customers in 29 other states ranging from 1 each (Arizona, Georgia, Idaho, Indiana, New Jersey, Oklahoma, South Carolina, Tennessee) to 51 (California), for a total of 156 customers. Pl. First Set of Interrog. at 5-6 (ECF No. 28). There is no information about what percentage of the defendant's total revenue or total number of customers these United States transactions represent.

5. It has no U.S. phone number or agent for service of process. Id.
6. It does not maintain servers here. Id.
7. Its website accepts payment only in euros. Id.

These facts in the parties' legal memoranda tell me little about what it is that the defendant actually *does*. But I am able to glean the following from the record about how the defendant's service and website operate:

1. The defendant is an information-technology company that provides its customers with a "self-service platform" to help the customers build better software.[2] Its customers use the defendant's self-service platform to improve source code the customers themselves have developed. The platform is "designed to improve source-code quality, eliminate bugs, and find security vulnerabilities in [the customers'] source-codes." It "provides a controlled cloud environment in which customers can run open-source and proprietary software analysis tools and their own automated tests." The defendant then "aggregates and refines the output . . . and presents it to the customer via its website." Schmitt Decl. at 1 (ECF No.12-1).
2. A customer must provide the defendant with the log-in credentials to the customer's third-party hosting account. When the customer then logs in to the defendant's website, the defendant's service can access the customer's third-party account. Ex. A to Def. Reply Mem. at 1 (ECF No. 17-2).
3. The defendant's service "retrieve[s]" the customer's software hosted by the third-party account in order to analyze the software. Id. at 2.
4. Customers must open an account with the defendant and pay for a subscription to use the services. Id.
5. The defendant emails invoices for its services, and customers must pay "using the payment methods provided by the defendant and chosen by the customer on his account's billing page." Id. at 3.

These too are uncontested facts.

---

[2] The defendant's terms of service specify: "Only entrepreneurs under section 14 of the German Civil Code can conclude Agreements with Scrutinizer on the use of Scrutinizer CI," Ex. A to Def. Reply Mem. at 2 (ECF No. 17-2), but the parties have not explained what that provision means or how it applies.

That is the factual record I use for the prima facie jurisdictional analysis.

**ANALYSIS**

**1.** ***Elements that Establish Specific Jurisdiction Under the Federal Long-Arm Statute***

The plaintiff seeks to support specific jurisdiction over the German defendant under Fed. R. Civ. P. 4(k)(2), the so-called federal long-arm statute. Nationwide personal jurisdiction in federal court can be obtained through service of process if (1) the claim "arises under federal law," (2) the defendant is "not subject to jurisdiction in any state's courts of general jurisdiction; and . . . [3] exercising jurisdiction is consistent with the United States Constitution and laws." Id. The defendant does not contest the first and second factors (arising under federal law; no jurisdiction in any state court). Def. Suppl. Mem. at 1 (ECF No. 27). Only the third factor, constitutionality, is in play.

Because federal law controls, the Fifth Amendment rather than the Fourteenth Amendment due process clause applies. That creates a conceptual difference because the Fifth Amendment, unlike the Fourteenth, does not involve the factor of relationships among states in our federal system. The fountainhead of current personal jurisdiction analysis, International Shoe v. Washington, 326 U.S. 310 (1945), dealt with state power to assert personal jurisdiction and generated its analysis for "our federal system of government." Id. at 317. And World-Wide Volkswagen stated:

> The concept of minimum contacts . . . can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States through their courts, do not reach out beyond the limits

> imposed on them by their status as coequal sovereigns in a
> federal system.

World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-92 (1980). World-Wide Volkswagen quoted approvingly from Hanson v. Denckla, 357 U.S. 235, 251 (1958): "Those restrictions [on personal jurisdiction] are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States." Accord Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty., 137 S. Ct. 1773, 1780 (2017) (quoting the same language from Hanson v. Denckla). When the issue is United States jurisdiction over a person or entity outside the country as here—thus not involving the relations among states in the U.S. federal system—the cases agree that the same minimum contacts requirement applies nevertheless. E.g., Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico, 563 F.3d 1285, 1295-96 (Fed. Cir. 2009) (noting that the constitutional limits on Rule 4(k)(2) come from the Fifth Amendment and applying the traditional minimum contacts analysis from *International Shoe*); United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618-21 (1st Cir. 2002) (same); Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1159 (9th Cir. 2006) (noting that the "due process analysis" under 4(k)(2) is "identical" to the analysis when a state is the relevant forum).[3]

---

[3] Arguably there is a difference in the sense that if 4(k)(2) jurisdiction is lacking, by definition the American plaintiff has no U.S. forum available to it at all, whereas when 4(k)(1)(A) jurisdiction is missing, the American plaintiff may still be able to sue in another American forum. None of the cases has articulated that as a factor, however, and the First Circuit's decision in Copia Commc'ns, LLC v. AMResorts, L.P., 812 F.3d 1 (1st Cir. 2016), appears to be a decision denying jurisdiction where no other American jurisdiction would be available.

Using the conventional jargon, the First Circuit has said that the legal elements for the constitutional analysis are: relatedness; purposeful availment; and reasonableness, United States v. Swiss Am. Bank, Ltd., 191 F.3d 30, 36 (1st Cir. 1999), and that "a plaintiff ordinarily must shoulder the burden of proving personal jurisdiction over the defendant." Id. at 40.

### a. Relatedness

"Relatedness" means that the "claim at issue arises out of or is related to a defendant's conduct within the forum." Id. at 36. Here, the plaintiff has alleged trademark infringement causing harm in the United States as a result of customers in the United States accessing the defendant's interactive website in the United States to obtain and pay for the defendant's "Scrutinizer" services. The defendant does not dispute relatedness. Mot. to Dismiss at 10-11.

### b. Purposeful Availment

Primarily the parties dispute the second element, purposeful availment. The First Circuit says that this element requires "that the defendant's contacts 'represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's presence before the state's courts foreseeable.'" Bluetarp Financial, Inc., v. Matrix Constr. Co., Inc., 709 F.3d 72, 82 (1st Cir. 2013) (citation omitted). For federal long-arm purposes, I treat the terms "forum state," "state's laws," and "state's court" as referring to the United States as a whole. Bluetarp adds that "when a defendant deliberately targets its behavior toward the society or economy of a particular forum, the forum should have the power to subject the defendant to judgment regarding that behavior," id., that

"the focus is on the defendant's intentions, and [that] the cornerstones are voluntariness and foreseeability. The defendant's contacts 'must be deliberate and not based on the unilateral actions of another party.'" Id. (citations omitted).

The plaintiff argues that in maintaining the interactive website in English, offering a 14-day free trial that (for that period) avoids paying in euros, bragging that it has customers and projects around the world, using other data-tracking companies that have servers in the United States, generating via the website customers in 30 states (including Maine) with revenue of €165,212.07 over 3-1/2 years, and filing an application for a U.S. trademark, the defendant has shown that it "expects its services to be utilized by customers in the United States," Pl. Opp'n at 5, that this is not "a pattern of isolated and haphazard sales by Defendant to customers in the United States," Pl. Suppl. Mem. at 1, and that the German defendant is "doing something more than maintaining a passive website that is indifferent to sales to United States customers." Id. at 1-2. The defendant, on the other hand, says that it has no contacts with the United States, that "it simply places its services within the stream of commerce by making them available on its website" without targeting the United States, that purchasers in the United States who want to purchase its services "must do so in a foreign currency," Def. Suppl. Mem. at 5, and that its activity is not sufficient for specific jurisdiction. Def. Suppl. Mem. at 2.

The First Circuit has not decided a specific jurisdiction case based solely on an interactive website or sales from an interactive website.[4]  Many other circuits have decided cases involving websites that are interactive to a greater or lesser degree, sometimes with other contacts.  Not surprisingly, the analysis is very fact-specific.  The Second Circuit found personal jurisdiction in New York where an Alabama- and California-based defendant used a "highly interactive" website to serve a nationwide market but also sent items physically into New York.  Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 170-71 (2d Cir. 2010).  The Third Circuit wants "evidence that the defendant 'purposefully availed' itself of conducting activity in the forum state, by directly targeting its

---

[4] It "has not explicitly considered the issue of purposeful availment in trademark infringement cases . . . where the only alleged contacts are (1) an interactive website available in the forum state and (2) that the allegedly-infringed trademark is owned by a forum company." A Corp. v. All Am. Plumbing, Inc., 812 F.3d 54, 61 (1st Cir. 2016).  The Supreme Court likewise has not done so.  As Justice Breyer says in his J. McIntyre concurrence, "what do those [plurality] standards mean when a company targets the world by selling products from its Web site?  And does it matter if, instead of shipping the products directly, a company consigns the products through an intermediary (say, Amazon.com) who then receives and fulfills the orders?  And what if the company markets its products through popup advertisements that it knows will be viewed in a forum?  Those issues have serious commercial consequences but are totally absent in this case." J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 890 (2011) (Breyer, J., concurring in the judgment).  The First Circuit's most recent decision about personal jurisdiction based upon a website appears to be a general jurisdiction case, Cossaboon v. Maine Med. Ctr., 600 F.3d 25 (1st Cir. 2010), and the First Circuit says that the analysis there is different.  Id. at n.5.  Nevertheless, I observe that in Cossaboon, the court said that "[i]t is clear that 'the mere existence of a website that is visible in a forum and that gives information about a company and its products is not enough, by itself, to subject a defendant to personal jurisdiction in that forum." Id. at 35 (citation omitted).  That is not this case.  The First Circuit went on to say: "Instead, for website activity to support the exercise of personal jurisdiction, '[s]omething more is necessary, such as interactive features which allow the successful online ordering of the defendant's products.'" Id. (citation omitted).  That interactive feature is available here. However, Cossaboon said such a feature was "necessary," not that it was sufficient.  Id.  Cossaboon said: "In addressing what 'more' is required to support the exercise of general jurisdiction based on website activity, courts have focused on the extent to which the defendant has actually and purposefully conducted commercial or other transactions with forum state residents through its website." Id.  Cossaboon also discussed whether the website targeted the forum's "residents in particular" or was "available to anyone with internet access," id., as part of its assessment of whether a defendant "purposefully availed itself of the opportunity to do business in [the forum]." Id.  The defendant argues that its web-based activities do not meet those Cossaboon purposeful requirements.  I address all those factors in text.

web site to the state, knowingly interacting with residents of the forum state via its web site, or through sufficient other related contacts." Toys "R" Us, Inc., v. Step Two, S.A., 318 F.3d 446, 454 (3d Cir. 2003).  The Fourth Circuit "requires proof that the out-of-state defendant's Internet activity is expressly targeted at or directed to the forum state." Young v. New Haven Advocate, 315 F.3d 256, 262-63 (4th Cir. 2002); Carefirst of Maryland v. Carefirst Pregnancy Ctrs., 334 F.3d 390, 400 (4th Cir. 2003) (requiring "manifest intent" to target, "determined only from the character of the website").  The Sixth Circuit is satisfied if the defendant maintains an interactive website and accepts the business of a substantial number (there 4,666) of forum residents or "regularly chooses to do business with [forum] residents." Bird v. Parsons, 289 F.3d 865, 874-75 (6th Cir. 2002).  The Seventh Circuit has said that an interactive website that is accessible from the forum state is not alone enough for specific jurisdiction: "a defendant must in some way *target* the forum state's market," be2 LLC v. Ivanov, 642 F.3d 555, 558-59 (7th Cir. 2011), and "simply because a few residents have registered accounts" is insufficient for constitutional minimum contacts.[5]  Id at 559.  The Ninth Circuit considers "the interactivity of the defendant's website,

---

[5] The Seventh Circuit has also said that "[s]pecific jurisdiction must rest on the *litigation-specific* conduct of the defendant in the proposed forum state," Advanced Tactical Ordnance Sys. v. Real Action Paintball, 751 F.3d 796, 801 (7th Cir. 2014), and rejected as sufficient a showing of a "few sales alone" via the interactive website.  Id.  (The Lanham Act violations asserted there were based upon a particular "blast email," not the universal use of a trademark on an interactive website as here.)  In uBID, Inc. v. GoDaddy Group, Inc., 623 F.3d 421, 427-28 (7th Cir. 2010), although there was no evidence that the defendant's advertising "specifically target[ed] [forum] customers," the Seventh Circuit found that the defendant had "thoroughly, deliberately, and successfully exploited the [forum] market" through widespread customer use of its online services in the forum generated by a national advertising campaign.  Nevertheless, the First Circuit has treated GoDaddy as a case in which "targeted marketing to customers in a forum may give rise to specific jurisdiction over a dispute involving a transaction that results from that marketing." Carreras v. PMG Collins, LLC, 660 F.3d 549, 555 (1st Cir. 2011) (citing GoDaddy).

the geographic scope of the defendant's commercial ambitions, and whether the defendant 'individually targeted' a plaintiff known to be a forum resident" to determine if there is "something more." Mavrix Photo, Inc. v. Brand Tech., Inc., 647 F.3d 1218, 1229 (9th Cir. 2011) (citations omitted). The Eleventh Circuit is satisfied if, "in addition to his fully interactive . . . website accessible in [the forum], [the defendant] had other contacts with [the forum]—through selling and distributing infringing goods through his website to [the forum's] consumers— and the cause of action here derives directly from those contacts." Louis Vuitton Malletier, S.A. v. Mosseri, 736 F.3d 1339, 1358 (11th Cir. 2013) (emphasis omitted).

Here there is no evidence that the German defendant targeted United States residents in particular. Its website was available to anyone in the world who had Internet access, and there is no evidence that it restricted its interactive purchasing feature. The plaintiff's argument that the website's use of English demonstrates targeting to the United States ignores the large number of English-speaking countries around the world, as well as the use of English as a lingua franca in many commercial transactions (as distinguished, for example, from the defendant's German language). Instead, the defendant's requirement of euros as a currency for transactions weakens the argument that this German defendant was soliciting Americans in particular. The 14-day free trial is a neutral factor, affecting all potential users regardless of their preferred currency. The defendant's marketing statement that companies around the world trust its service certainly suggests that it was placing its service in commerce everywhere,

but not that the defendant targeted the United States.[6]  (The fact that the defendant uses third parties that may have servers in the United States is not related to this trademark infringement cause of action and I therefore do not consider it.[7])

At the same time, this defendant can be said to have wanted, if not targeted,[8] business outside its home country of Germany; it adopted an

---

[6] In that respect, I note the status of "stream of commerce" jurisprudence in the First Circuit. The Supreme Court has twice been unable to muster a majority opinion on how to treat placing something in the stream of commerce in determining whether personal jurisdiction exists. J. McIntyre Mach., Ltd., v. Nicastro, 564 U.S. 873 (2011); Asahi Metal Indus. Co. v. Superior Court of California, Solano Cty., 480 U.S. 102 (1987); see Old United Cas. Co. v. Flowers Boatworks, No. 2:15-cv-43-DBH, 2016 WL 1948873, at *5-6 (D. Me. May 3, 2016) (discussing J. McIntyre and Asahi).  In Boit v. Gar-Tech Prod., 967 F.2d 671 (1st Cir. 1992), the First Circuit noted the divided vote in Asahi, but held that its previous precedent, Dalmau Rodriguez v. Hughes Aircraft Co., 781 F.2d 9 (1st Cir. 1986), was still binding.  967 F.2d at 683.  Hughes rejected a broad stream of commerce theory of personal jurisdiction, 967 F.2d at 682, holding that "[t]he test is *not knowledge of the ultimate destination of the product, but whether the manufacturer has purposefully engaged in forum activities so it can reasonably expect to be haled into court there.*" Boit, 867 F.2d at 682 (emphasis added) (quoting Hughes approvingly).  Harlow, pre-J. McIntyre, reaffirmed that stance.  432 F.3d at 63.  Following the later divided decision in J. McIntyre, the First Circuit has given no indication that it has altered its view of the law.  See C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 68 (1st Cir. 2014) (citing J. McIntyre without suggesting it altered circuit law in any way); Adelson v. Hananel, 652 F.3d 75, 81-82 & n.2 (1st Cir. 2011) (same); Carreras v. PMG Collins, LLC, 660 F.3d 549, 555 (1st Cir. 2011) (same).  But I conclude that the plaintiff has met the Hughes standard.

It also may be that direct sales over a website are not actually subject to stream of commerce analysis as that phrase has generally been understood.  See, e.g., J. McIntyre Machinery, Ltd. v. Nicastro, 564 U.S. 873, 881 (2011) (opinion of Kennedy, J.) ("[The stream of commerce metaphor] refers to the movement of goods from manufacturers through distributors to consumers . . . ."); D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 105 (3d Cir. 2009) (the stream of commerce is "generally understood" to mean "'the regular and anticipated flow of products from manufacture to distribution to retail sale.'") (citation omitted).  As with so many issues, however, it is not clear how the Internet affects the "stream of commerce" concept.  I therefore assume that direct sales over the Internet are part of the stream of commerce as the defendant has argued and as other courts have assumed.  See, e.g., Bridgeport Music, Inc. v. Still N The Water Pub., 327 F.3d 472 (6th Cir. 2003).

[7] A defendant's forum contacts are relevant only if the cause of action "arises out of or relates directly to" them.  Copia Commc'ns, LLC v. AMResorts, L.P., 812 F.3d 1, 5 (1st Cir. 2016) (citing Harlow, 432 F.3d 50, 60-61 (1st Cir. 2005)).

[8] Actually, cases like this show that the "targeting" metaphor may have outlived its usefulness when it comes to websites and cloud-based services that are accessible anywhere.

interactive website that accepted without restriction business from Maine and the United States, accepted transactions that resulted in both a substantial number of customers and a sturdy revenue stream from the United States, emailed its billing invoices to those customers, and on its interactive website touted its customers and projects around the world.[9]  As part of showing no purposeful availment, the defendant points out that in its contracts with customers it inserted a forum selection and choice of law clause requiring that all lawsuits must be in German courts and that German law applies.  Def. Reply Mem. at 7 & Ex. A at 5-6 (ECF No. 17 & 17-2).  This language does not bind those, like this plaintiff, who are not subject to a contract, but it does demonstrate that the defendant knew it was extending its reach outside Germany and decided to take steps to deal with foreign contract-based litigation.[10]

This case presents the quintessential Internet-based personal jurisdiction quandary.  It does not help the analysis to say that the defendant reached or did not reach *into* the United States, or that customers in the United States reached or did not reach *out to* the defendant's out-of-country website.  Through the website, the United States customers did proceed to make all the necessary contacts to obtain the defendant's services.  As the defendant points out, they could (and sometimes did) do so from anywhere in the world given the cloud-

---

[9] Its statement that its employees were not personally aware that orders were coming from Maine, Mot. to Dismiss at 5, is irrelevant given the website design that allowed worldwide purchases. Cf. GoDaddy, 623 F.3d at 428 ("[Defendant] itself set up the system this way.  It cannot now point to its hundreds of thousands of customers in [the forum] and tell us, 'It was all their idea.'").

[10] Cf. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 482 (1985) ("Nothing in our cases . . . suggests that a choice-of-law *provision* should be ignored in considering whether a defendant has [purposefully availed itself of a forum].").

based nature of its service. The defendant then emailed invoices to them and continued to accept their American business—now for 3-1/2 years.

I conclude that this German defendant operated a highly interactive website that sold its cloud-based services directly through the website, that it was open to business throughout the world, that it accepted recurrent business from the United States in a substantial amount, and that it did so knowingly.[11]

The conventional judicial concern in these interactive website cases is fear of adopting a standard that would impose worldwide exposure to lawsuits on any enterprise that does business through an interactive website. For example, "the mere operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world." Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 454 (3d Cir. 2003); accord Advanced Tactical Ordnance Sys. v. Real Action Paintball, 751 F.3d 796, 801-02 (7th Cir. 2014) (rejecting "universal jurisdiction"); 6 McCarthy on Trademarks and Unfair Competition § 32:45.50 (5th ed.) ("The vast majority of courts reject the universal jurisdiction view."). That concern is misplaced here. This German defendant has engaged in sizeable and continuing commerce with United States customers through its interactive website. It should not be surprised at United States-based litigation. I conclude that it meets the standards that some other circuits have set: although it does not ship physical products into the forum (Second and Eleventh

---

[11] Although some circuits use the analysis of Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997), I have not explicitly done so here. The First Circuit has neither rejected nor endorsed that approach. Cossaboon, 600 F.3d at 36 n.5. My colleagues in this District have not adopted it, Auburn Mfg v. Steiner, 493 F. Supp.2d 123, 128 n.3 (D. Me. 2007); Henderson v. Laser Spine Inst., 815 F. Supp. 2d 353, 377 (D. Me. 2011), and the Eleventh Circuit has pointed out scholarly criticism of it. Oldfield v. Pueblo De Bahia Lora, S.A., 558 F.3d 1210, 1219 n.26 (11th Cir. 2009). Applying it would not change the outcome.

Circuits), well more than "a few residents" (Sixth and Seventh Circuits) have established accounts with the defendant over its website; it has "knowingly interact[ed] with residents of the forum state via its web site" (Third Circuit); and if it did not expressly target the United States in particular (Fourth Circuit), its interactive website made clear that it would take business from anywhere, and it continued to do so while billing its customers by email (Ninth Circuit, except for individual targeting).

In reaching this conclusion, I have not yet addressed the relevance of the defendant's post-lawsuit January 2017 application to obtain a trademark for "Scrutinizer" with the United States Patent and Trademark Office. The plaintiff argues that I should consider that "contact" in determining jurisdiction for this lawsuit filed on November 21, 2016. The defendant disagrees.

According to the First Circuit in a case dealing with Maine's long-arm statute: "Three key themes of specific jurisdiction analysis require that the proper focus be on those *contacts leading up to and surrounding the claimed injury* . . . . These three concepts are all related, and they mean that in analyzing specific jurisdiction, *contacts must generally be limited to those before and surrounding the accrual of the cause of action. . . .* [I]n most cases, *contacts coming into existence after the cause of action arose will not be relevant.*" Harlow, 432 F.3d at 61-62 (emphasis added); accord Venmill Ind. Inc. v. ELM, Inc., 100 F. Supp. 3d 59, 70 & n.7 (D. Mass. 2015) (citing 16 James William Moore,

Moore's Federal Practice § 108.42[2][a], Harlow, supra, and Merial Ltd. V. Cipla Ltd., 681 F.3d 1283, 1294 (Fed. Cir. 2012)).[12]

Harlow, the First Circuit case I have just quoted, was a medical malpractice case, *i.e.*, a discrete-in-time tort. This case, on the other hand, involves continuing "tortious" conduct in the defendant's allegedly infringing activity, and the plaintiff seeks declaratory and injunctive relief. (Damages are requested, but they are not tied to any particular infringement.) If the plaintiff should move to amend its Amended Complaint to add new infringing activity in support of its claims for equitable relief (the defendant's website continues in existence), I would undoubtedly grant the motion. Why therefore should I not consider the defendant's more recent trademark application filing? In typical appellate fashion, Harlow did not lay out a hard-and-fast rule. Instead its principle applies "generally" and "in most cases." 432 F.3d at 61, 62. Rather than wait for a motion to amend (or indeed a new lawsuit, since a dismissal for lack of jurisdiction is without prejudice on the substantive issue and a new lawsuit might be able to use the trademark application filing to show personal jurisdiction), I conclude that the situation here may lie outside Harlow's "generally/most cases" rule and that I should consider the defendant's post-lawsuit federal trademark application filing for whatever impact it has.

---

[12] The plaintiff cites four cases in support of its argument that I should consider the defendant's trademark application filing. In all four, however, the application had been filed *before* the plaintiff began its lawsuit. VMR Prods., LLC v. V2H ApS, No. 13-7719, 2014 WL 12591932, at *4 (C.D. Cal. Aug. 4, 2014); CytoSport, Inc. v. Cytogenix Sports Labs., No. 10-700, 2010 WL 5418883 (E.D. Cal. Dec. 23, 2010) (date of filing is not specified but since the complaint seeks cancellation of the trademark, logical to infer that the filing occurred earlier); Monster Cable Prods. Inc. v. Euroflex S.R.L., 642 F. Supp. 2d 1001 (N.D. Cal. 2009); Figawi, Inc. v. Horan, 16 F. Supp. 2d 74, 81-82 (D. Mass. 1998).

But does that application filing make a difference in determining personal jurisdiction? The record gives me no hint why the defendant filed its federal application;[13] some of the cases that the defendant cites suggest that such a filing is a prerequisite to a cease-and-desist letter that a defendant may wish to send,[14] but neither party has spoken to whether that is why the defendant filed its application. In the end, the defendant's United States trademark application filing is not a factor that tips the scales, but it does confirm the defendant's desire to deal with the American market and thus purposeful availment.

### c. *Reasonableness*

"Reasonableness" means "that, even where purposefully generated contacts exist, courts must consider a panoply of other factors which bear upon the fairness of subjecting a nonresident to the authority of a foreign tribunal." Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 209 (1st Cir. 1994) (citation omitted). Reasonableness is a question of "the fundamental fairness of an exercise of jurisdiction." Swiss American, 274 F.3d at 621 (citation omitted). The Supreme Court has identified five factors in assessing whether it is reasonable under the Fourteenth Amendment due process clause to require a defendant to appear in a particular forum. The First Circuit calls them the gestalt factors. They are: (1) the defendant's burden in appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the

---

[13] In the Amended Complaint the plaintiff alleges that the defendant "has not filed any applications to register the term SCRUTINIZER as a trademark in the United States Patent and Trademark Office . . . ." Am. Compl. ¶ 12. Perhaps in response, the defendant has now done so.
[14] Venmill Indus., Inc. v. ELM, Inc., 100 F. Supp. 3d 59, 67, 69 (D. Mass. 2015) (citing Avocent Huntsville Corp. v. Aten Int'l Co., 552 F.3d 1324, 1334-35 (Fed. Cir. 2008)).

most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies. <u>Ticketmaster</u>, 26 F.3d at 209. I address each with respect to a United States forum generally, not this District specifically.[15] If personal jurisdiction in a federal court is proper under federal long-arm principles, the defendant has the ability to use the federal venue provision, 28 U.S.C. § 1404(a), to seek a fairer forum within the United States.

### *(1) The Defendant's Burden*

There is some burden in crossing the Atlantic from Germany to the United States, but it is not what it used to be. By that I mean that there is abundant and efficient air travel and, just as important, much legal and judicial business in today's world is accomplished electronically. All pleadings and most discovery—documents, admissions, interrogatories—can be conducted remotely. As the plaintiff has noted, even in-person depositions are generally held in the deponent's home jurisdiction. Pl. Opp'n at 4. Hearings short of trial can be and often are conducted by telephone or videoconference. Most cases are resolved short of trial,[16] but trial at a distance could be a burden. Even at trial, however,

---

[15] To my knowledge, no court has offered a detailed account of how the gestalt factors apply to 4(k)(2) cases or, more generally, to cases where the Fifth Amendment sets the constitutional limit on jurisdiction. As I do here, courts tend to analyze them in light of the United States being the relevant forum. <u>E.g.</u>, <u>Touchcom, Inc. v. Bereskin & Parr</u>, 574 F.3d 1403, 1417-18 (Fed. Cir. 2009); <u>Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico</u>, 563 F.3d 1285, 1299-1300 (Fed. Cir. 2009). The Federal Circuit has hinted that the fourth and fifth factors, which address federalism concerns, may not apply in 4(k)(2) cases. 563 F.3d at 1300 ("To the extent that the fourth and fifth due process factors apply when the United States is the forum . . . ."). Outside the 4(k)(2) context, at least one court has said that the "fourth and fifth factors are not significant in deciding this issue of jurisdiction over a foreign national." <u>In re Sumitomo Copper Litigation</u>, 120 F. Supp. 2d 328, 344 (S.D.N.Y. 2000) (citation omitted).

[16] Of the 271,302 civil cases disposed of in the federal district courts during the twelve-month period ending September 30, 2016, only 2,781 were terminated during or after trial. That's 1.03%. <u>See</u> Administrative Office of the United States Courts, Judicial Business 2016, Table C-4, http://www.uscourts.gov/sites/default/files/data_tables/jb_c4_0930.2016.pdf.

videotaped depositions can be used and videoconferencing is sometimes used for remote testimony. The physical burden is no longer severe.

At bottom, this burden factor has a lot to do with what lawyers the parties will hire (American or German) to manage the litigation, their comfort with those lawyers, and their (dis)comfort with the respective court customs and practices. And on that score, it is significant. According to <u>Asahi</u>, subjecting a defendant to a foreign legal system is a "severe" and "unique" burden, to be accorded "significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." 480 U.S. at 114 (opinion of O'Connor, J. writing for eight members of the Court).

### (2) The Forum State's Interest

The United States has an important interest in the scope and application of U.S. trademark law and the protection of those who invoke it, and this defendant does a substantial amount of business with United States-based customers.

### (3) The Plaintiff's Interest in Obtaining Convenient and Effective Relief

The plaintiff's interest in obtaining convenient and effective relief supports a United States forum.

### (4) The Judicial System's Interest in Obtaining the Most Effective Resolution of the Controversy

The parties have not satisfactorily addressed this factor, nor whether it even applies in a Fifth Amendment case. <u>See</u> <u>supra</u> note 15. I do not know whether the courts of Germany have any interest in the scope of U.S. trademark law or how they would address the dispute. I also have no information about

whether other countries' trademark laws are involved. The United States judicial system does have an interest in the dispute's effective resolution, because the plaintiff does business here and because United States laws are at stake.

### (5) The Common Interests of All Sovereigns in Promoting Substantive Social Policies

I do not know how to address this factor in the context of international online commerce and intellectual property, and so I consider it neutral, assuming it even applies.

*  *  *  *  *

The defendant has conceded relatedness, and the plaintiff has made a solid showing of the defendant's purposeful availment of American commerce. The defendant's burden to avoid United States jurisdiction based upon unreasonableness is therefore heavier.[17] Assessing all the gestalt factors I have enumerated above, I conclude that requiring this German defendant to respond in a United States federal forum under Rule 4(k)(2) is constitutional. Only the burden factor counts against jurisdiction, and while it is significant in <u>Asahi</u> terms, the defendant has not convinced me, as it must,[18] that the gestalt factors collectively militate against national jurisdiction. <u>Asahi</u> recognized that "[w]hen minimum contacts have been established, often the interests of the plaintiff and

---

[17] "[T]he reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on the first two prongs . . . the less a defendant needs to show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true." <u>Ticketmaster-New York, Inc. v. Alioto</u>, 26 F.3d 201, 210 (1st Cir. 1994).

[18] Once the plaintiff has made a showing of relatedness and purposeful availment, "the burden shifts to [the defendant] to convince the court that the Gestalt factors militate against the exercise of jurisdiction." <u>Auburn Mfg.</u>, 493 F. Supp. 2d at 130-131; <u>see also</u> <u>Foster-Miller, Inc. v. Babcock & Wilcox Canada</u>, 46 F.3d 138, 145 (1st Cir. 1995) (plaintiff "must carry the devoir of persuasion on the elements of relatedness and minimum contacts") (citations omitted); <u>Ticketmaster</u>, 26 F.3d at 210 (burden on defendant "to show . . . unreasonableness to defeat jurisdiction").

the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." 480 U.S. at 114. That is the case here.

### 2. The Maine Long-Arm Statute

Initially the plaintiff asserted jurisdiction under Fed. R. Civ. P. 4(k)(1)(A) as well. That subsection recognizes jurisdiction in this federal court if a Maine state court would have jurisdiction. Maine's long-arm statute extends its courts' personal jurisdiction to the full extent the Constitution permits. Archibald v. Archibald, 826 F. Supp. 26, 28 (D. Me. 1993) (citing 14 M.R.S.A. § 704-A). Therefore, like the federal provision, the issue is constitutionality. However, the analysis applies to a different forum—Maine—and because it is a state provision, the Fourteenth Amendment applies in assessing the statute.

I conclude that the Maine long-arm statute cannot constitutionally justify personal jurisdiction here. The amount of Maine business is miniscule—in the words of the First Circuit, only "attenuated contacts," Carreras, 660 F.3d at 555, and the defendant was unaware that it even had Maine-based customers until this lawsuit. Schmitt Decl. at 2 (ECF No. 12-1). The defendant could not reasonably have expected to be haled into a Maine forum, and thus there was no purposeful availment. I also conclude that the plaintiff does not satisfy the reasonableness standard for a Maine forum. Maine has some interest in this dispute in its concern for companies that do business in Maine and their well-being, but not in the law, which is federal. Maine's interest is very modest.

### CONCLUSION

In finding jurisdiction, I am not deciding whether the Lanham Act applies to this German defendant's activity. The Act applies to activity "in commerce,"

15 U.S.C. § 1125(a)(1), and commerce is defined as "all commerce which may lawfully be regulated by Congress." Id. § 1127. The parties have not argued extraterritorial application, subject-matter jurisdiction,[19] or choice of law to me, and I have no information about what rights to the Scrutinizer mark the defendant may have in Germany and how those interact, if they do, with United States trademark law.[20]

---

[19] The First Circuit treats the extraterritoriality of the Lanham Act as a subject matter jurisdiction issue, McBee v. Delica Co., Ltd., 417 F.3d 107 (1st Cir. 2005), while the Ninth Circuit does not. Trader Joes v. Hallatt, 835 F.3d 960, 966 (9th Cir. 2016). But the First Circuit's decision preceded the Supreme Court decision in Morrison v. National Australia Bank Ltd., 561 U.S. 247, 254 (2010), which held in a securities case that asking what extraterritorial conduct a statute reaches "is a merits question," not a subject-matter jurisdiction question.

[20] These could be difficult issues. See Case Comment, *Foreign Relations Law—Lanham Act Extraterritoriality—Ninth Circuit Applies Lanham Act to Wholly Foreign Sales*, 130 Harv. L. Rev. 1946 (2017); John Sokatch, *A "Likelihood of Confusion": Circuit Courts Attempt to Reconcile Sixty Years of SCOTUS Silence Since* Bulova, 21 Tex. Intell. Prop. L.J. 345 (2013) The Supreme Court has not decided a Lanham Act case with impacts outside the country since Steele v. Bulova Watch Co., 344 U.S. 280 (1952). There it applied the Lanham Act to activity in Mexico by an American citizen. It referred to the principle "that the legislation of Congress will not extend beyond the boundaries of the United States unless a contrary legislative intent appears," id. at 285, but found it important that applying it in that case was an ordinary application of a country's law to "the conduct of its own citizens," id. at 285. In 1991, the Court referred to Bulova Watch as based upon "the fact that the allegedly unlawful conduct had some effects within the United States, coupled with the Act's 'broad jurisdictional grant' and its 'sweeping reach into "all commerce which may lawfully be regulated by Congress."'" EEOC v. Arabian American Oil Co., 499 U.S. 244, 252 (1991). In 2005, the First Circuit stated that "[i]t has long been settled that the Lanham Act can, in appropriate cases, be applied extraterritorially," and proceeded to lay out "a framework for determining when such extraterritorial use of the Lanham Act is proper," recognizing that it was different from what other circuits did. McBee, 417 F.3d at 110. But recent Supreme Court jurisprudence has been increasingly restrictive of the extraterritorial impact of federal statutes. See RJR Nabisco Inc. v European Community, 136 S.Ct. 2090 (2016); Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659 (2013); Morrison, 561 U.S. 247; Case Comment, *Extraterritoriality:* RJR Nabisco, Inc. v. European Community, 130 Harv. L. Rev. 487, 487 (2016) (noting the "wider trend limiting the extraterritorial application of U.S. law"). In referring to the presumption against extraterritorial effect, the Supreme Court says that the first question always is whether the statute "gives a *clear, affirmative* indication that it applies extraterritorially." RJR Nabisco, 136 S. Ct. at 2101 (emphasis added). If, as some courts and commentators think, Bulova Watch and Arabian American Oil Co. hold that Congress clearly intended the Lanham Act to have extraterritorial effect, then it would apply to all such conduct "barring some other limitation." RJR Nabisco, 136 S. Ct. at 2101 (quoting Morrison). Without briefing and argument, I am uncertain what impact these recent decisions have on the First Circuit's decision in McBee. (The Ninth Circuit recently applied the Lanham Act extraterritorially, Trader Joe's, 835 F.3d 960, but the defendant there had far more contacts with the United States than this defendant.)

Accordingly, the defendant's motion to dismiss is **DENIED** and the lawsuit may proceed on account of Rule 4(k)(2).

The Clerk's Office shall schedule a conference of counsel before me to discuss further proceedings in this case.

**SO ORDERED.**

**DATED THIS 18TH DAY OF OCTOBER, 2017**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**