UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| PLIXER INTERNATIONAL, INC.,     ) | |
|       ) | |
|      PLAINTIFF     ) | |
|       ) | |
| v.     ) | CIVIL NO. 2:16-CV-578-DBH |
|       ) | |
| SCRUTINIZER GMBH,     ) | |
|       ) | |
|      DEFENDANT     ) | |

DECISION AND ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

This is a trademark infringement case. Both parties use the name "Scrutinizer" for software products that, broadly speaking, are acquired by professionals in information technology. The plaintiff Plixer's Scrutinizer product, for which Plixer holds a trademark, is primarily a network tool, analyzing data flowing in and out of a network. The defendant Scrutinizer's product is a development tool, helping users test their source code and find bugs.[1] The defendant has moved for summary judgment arguing that there is no likelihood of confusion between the parties and their products. This is a close case, where there is only one weak example of actual confusion and the parties dispute whether their products' functionality, customers, and other details overlap. There remain, however, material facts in dispute upon which a

---

[1] Because Scrutinizer is both the name of the trademark and the name of the defendant, I speak of the defendant as only "the defendant" and use Scrutinizer to refer to the product and/or the mark to avoid confusion about what I am discussing. I refer to the plaintiff by its name, Plixer.

factfinder could find a likelihood of confusion.  I therefore **DENY** the defendant's motion for summary judgment.

### FACTS

In deciding a motion for summary judgment, I "take as true the facts documented in the record" and "resolv[e] any factual conflicts or disparities in favor of" the non-moving party, Plixer.  Colt Def. LLC v. Bushmaster Firearms, Inc., 486 F.3d 701, 705 (1st Cir. 2007).  I also "draw all reasonable inferences in favor of the non-moving party."  Dorpan, S.L. v. Hotel Melia, Inc., 728 F.3d 55, 58 (1st Cir. 2013).  Thus, the question is "whether the evidence as a whole, taken most hospitably to the markholder [Plixer], generates a triable issue as to likelihood of confusion."  Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 201 (1st Cir. 1996).

I turn first to the central facts.  I provide further details in the appropriate sections of the legal analysis below.

The plaintiff Plixer is a Maine-based company that has used the Scrutinizer name for its "flagship" network analysis software since around the time Plixer was founded in November 2005.  Joint Stipulations of Fact ¶ 1 (ECF No. 119-2) ("JSF"); Bilodeau Dep., Segal Decl. Ex. 1, at 13:14-14:7 (ECF No. 106-

20).[2]   Plixer has used the Scrutinizer mark[3] continuously since then.   Pl.'s

Answers to First Set of Interrogs., Segal Decl. Ex. 6, at 4 (ECF Nos. 106-24 (public

version) & 107-6 (sealed version)).   Plixer obtained a federal trademark

registration for the word Scrutinizer in 2017 for use in association with

"[c]omputer software and hardware for analyzing, reporting and responding to

malware infections and application performance problems, used in the field of

information technology."   JSF ¶ 3.[4]

From the beginning, Plixer's Scrutinizer product has provided analysis of

data moving through a network, including "network bandwidth monitoring"—

checking the amount of data being transmitted over a network—and "anomaly

detection," which involves looking for problems on a network.   Bilodeau Dep.,

Mot. Ex. A, at 11:18-12:25 (ECF Nos. 94-2 (public version) & 95-4 (sealed

---

[2] A partial transcript of the deposition of Marc Bilodeau, Plixer's co-founder, is attached to the defendant's motion as Exhibit A (ECF Nos. 94-2 (public version) & 95-4 (sealed version)).  Another partial transcript of the same deposition, containing different pages, is attached to the plaintiff's opposition as Segal Declaration Exhibit 1 (ECF No. 106-20).   Some of the testimony and documents filed in this case, including parts of this deposition, have been sealed because they contain "sensitive, non-public information" related to revenue, expenditure, or pricing.  E.g., Consent Mot. to Seal (ECF No. 107); Order Granting Mot. (ECF No. 111).

[3] The mark at issue in this case is a wordmark, Scrutinizer, without regard to any font, size or color.  Segal Decl. Ex. 4 at 2 (ECF No. 106-22) (Scrutinizer trademark registration).  Plixer has not changed this mark since it began its use.  The defendant's argument about tacking, see Def.'s Reply at 1-3 (ECF No. 115), is inapplicable.

[4] The defendant attempted to trademark Scrutinizer in 2017, but the Patent and Trademark Office rejected its application, finding a likelihood of confusion with Plixer's trademark.  Segal Decl. Ex. 15 at 5 (ECF No. 106-33) (Patent and Trademark Office denial).  The First Circuit has not decided whether courts should give such findings any weight.  Most other courts to have considered the issue give the PTO's finding "little to no weight."  4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:84 (5th ed. 2020); see A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 221 (3d Cir. 2000) ("[A]lthough an initial PTO determination by an examining attorney may be considered, it need not be given weight when the PTO attorney did not review all the evidence available to the District Court."); Progressive Distrib. Servs., Inc. v. United Parcel Serv., Inc., 186 F. Supp. 3d 741, 749 (W.D. Mich. 2016) (collecting cases—from the Sixth and Ninth Circuits, W.D. Tex. and S.D. Ohio—in which the courts gave a PTO examiner's denial little to no weight).  Following the majority of courts, I give the office's denial no weight here.

version)).   Plixer expanded its Scrutinizer product in 2011 into the "security space," analyzing data "to detect anomalous behavior that could indicate a security threat" on a network.   Bilodeau Decl. ¶ 15 (ECF Nos. 106-1 (public version) & 107-4 (sealed version)).[5]   Plixer's Scrutinizer can also take in and analyze at least some types of information beyond network data.   Bilodeau Dep., Segal Decl. Ex. 1, at 14:10-15:19.

Most of Plixer's Scrutinizer users are personnel involved in network operations, and 30 to 40 percent are involved in security.   Bilodeau Dep., Mot. Ex. A, at 31:25-32:6; Bilodeau Dep., Segal Decl. Ex. 1, at 21:6-11.   A "small percentage" are developers (people who write computer code), Bilodeau Dep., Mot. Ex. A, at 32:5-6, who use Plixer's Scrutinizer product to analyze whether their code is producing the kind of output they intended, Bilodeau Dep., Segal Decl. Ex. 1 at 25:13-27:17.

The defendant is Scrutinizer GmbH, a German-based company that chose the name Scrutinizer in 2012.   JSF ¶ 21; Def.'s Answers to Interrogs., Segal Decl. Ex. 13, at 8 (ECF Nos. 106-31 (public version) & 107-8 (sealed version)).   It sells software that helps developers analyze their code to make sure it works as

---

[5] The defendant asks me to strike Bilodeau's declaration because it contradicts his prior deposition testimony.  Def.'s Reply at 3-4 (ECF No. 115).  I disagree that there is a contradiction. Bilodeau testified that Plixer's product does not give feedback about source code "out of the box," but additional code "could be written to do such things."  Bilodeau Dep., Mot. Ex. A, at 27:18-25; see also id. at 113:4-24 (although Scrutinizer does not currently analyze source code, he could "write an algorithm in Scrutinizer" to do that).  Bilodeau's subsequent declaration stated that Scrutinizer's "off-the-shelf" capabilities include analyzing text, and, since source code is text, "[u]sers are able to create their own algorithms" to build on Scrutinizer's text analysis capability and thereby "analyze computer code."  Bilodeau Decl. ¶ 19.  In his deposition, Bilodeau indicated that was possible:  "Q. Does the Scrutinizer service, in any of its iterations, analyze and suggest improvements for how code is written?  A.  . . . We can analyze text files—which code is text files—for something that doesn't look right."  Bilodeau Dep., Segal 2d Decl. Ex. 18, at 41:17-42:3 (ECF No. 125-2).

intended before deploying it live.  Schmitt Dep., Mot. Ex. N, at 63:4-15, 72:17-
25 (ECF Nos. 94-15 (public version) & 95-17 (sealed version)).  Among other
features, it offers a color-coded system to point out the location of any bugs in a
user's code.  Id. at 46:6-47:1, 50:2-9, 54:7-12.  The defendant's Scrutinizer
product can also check code for security problems that could leave the code
vulnerable to attack once it goes live.  Id. at 70:4-21.  The product's users are
developers, including individual freelancers and personnel within larger
organizations.  Id. at 89:19-90:15.

Plixer filed this lawsuit in November 2016, claiming that the defendant's
use of the name Scrutinizer infringed on Plixer's rights to the mark.  See First
Am. Compl. (ECF No. 4).  The defendant filed a motion for summary judgment
on December 6, 2019 (ECF Nos. 118 (public version) & 95-1 (sealed version)).  It
argues there is no likelihood of confusion between its Scrutinizer product and
Plixer's because, among other reasons, the products perform different functions
and target different groups of customers.  Additionally, it notes that Plixer can
identify only one instance of actual confusion, described below, which was
quickly cleared up and apparently did not result in a lost sale.  See JSF ¶¶ 15-
18.

## LEGAL FRAMEWORK

"Summary judgment is appropriate in trademark infringement cases, as
elsewhere, 'if the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law.'"  Int'l Ass'n of Machinists & Aerospace Workers v.
Winship Green Nursing Ctr., 103 F.3d 196, 199 (1st Cir. 1996) (quoting Bos.
Athletic Ass'n v. Sullivan, 867 F.2d 22, 24 (1st Cir. 1989)); Fed. R. Civ. P. 56(c).
"A factual dispute is material if it affects the outcome of the litigation, and
genuine if manifested by substantial evidence going beyond the allegations of the
complaint."  Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d
482, 486 (1st Cir. 1981).

The defendant's claim that Plixer cannot show a likelihood of confusion
faces an uphill battle at the summary judgment stage.  "Because the likelihood
of confusion analysis is a particularly fact-intensive one, resolving this issue on
summary judgment is disfavored."  Dorpan, S.L. v. Hotel Melia, Inc., 728 F.3d
55, 66 (1st Cir. 2013); see also Pignons, 657 F.2d at 486 ("[S]ummary disposition
is usually inappropriate in complex infringement and unfair competition cases.").

## ANALYSIS

To assess likelihood of confusion, I analyze the eight factors laid out in
Pignons: "the similarity of the marks; the similarity of the goods; the relationship
between the parties' channels of trade; the relationship between the parties'
advertising; the classes of prospective purchasers; evidence of actual confusion;
the defendants' intent in adopting its mark; and the strength of the plaintiff's
mark."  Pignons, 657 F.2d at 487.  "No one factor is necessarily determinative,
but each must be considered."  Dorpan, 728 F.3d at 66 (quoting Astra Pharm.
Prods., Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1205 (1st Cir. 1983)).

I take these factors in the order given by Pignons, except that I save the evidence of actual confusion for last.

### *Similarity of the Marks*

"The degree of similarity between two marks . . . is determined by analyzing their sight, sound, and meaning" and considering "the total effect of the designation, rather than a comparison of individual features." Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 24 (1st Cir. 2008). Here, the analysis of similarity is simple. The trademark at issue is only the word Scrutinizer, without regard to "any particular font style, size or color." Segal Decl. Ex. 4 (ECF No. 106-22) (Scrutinizer trademark registration). The defendant uses the same word. Thus, the marks are the same.

Even if I were to consider the graphical elements accompanying the two marks, I would still conclude the marks are the same. The parties both present the word on a solid-color background. See Pl.'s Opp'n at 3 (ECF Nos. 104 (public version) & 107-1 (sealed version)) (showing the primary variations). At various times, Plixer also depicted "Scrutinizer" alongside a graph-like image, with the words "Incident Response System" underneath. Bilodeau Decl. ¶ 7; Mot. Ex. B (ECF Nos. 94-3 (public version) & 95-5 (sealed version)) (screenshot of the plaintiff's website). The defendant often presents the word "Scrutinizer" next to a large, two-color S. See Mot. Ex. T (ECF Nos. 94-21 (public version) & 95-23 (sealed version)) (screenshot of the defendant's website). In each variation, the parties continue to use the word "Scrutinizer," and it remains the centerpiece.

Since the parties' marks each have "Scrutinizer" as "their most salient word," they are "essentially identical for trademark purposes." Dorpan, 728 F.3d at 66 ("The marks 'Hotel Meliá' and 'Gran Meliá' are essentially identical for trademark purposes because both marks have the word 'Meliá' as their most salient word."); see also Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Crédito Oriental, 832 F.3d 15, 28 (1st Cir. 2016) ("Where two marks share their most salient word, that fact weighs strongly in favor of similarity."). Although the parties have sometimes added minor elements alongside the Scrutinizer word, that does not affect my conclusion at the summary judgment stage that the marks are the same. See Oriental Fin. Grp., 832 F.3d at 28 ("The addition of a suggestive or descriptive element to the dominant word in a mark is generally not sufficient to avoid confusion.").

### Similarity of Products

The next factor is the similarity of the products, determined by examining their appearance, functionality, and price. Pignons, 657 F.2d at 487-88. The similarity of the products is one of the closest issues in this case. Even though their pricing is different, I conclude that the products' functionality overlaps enough that a factfinder could conclude this factor supports likelihood of confusion.[6]

The defendant's product analyzes computer code while the code is being developed, helping users find bugs and other problems before deploying their

---

[6] As for the products' appearance, these are both software programs that display a variety of information on a user's computer screen. Unless the user has opened the program, there is nothing to see. I do not find the products' appearance to be relevant in this case.

code live.    Schmitt Dep. at 63:4-15, 72:17-25.    Its software can execute

commands written into code to check if the commands work as expected, and it

can help the code developers identify the locations of any bugs.  Id. at 47:16-25,

50:2-9, 54:13-25.    It also offers some security features, checking code for

vulnerabilities that could allow attacks once the code goes live.  Id. at 70:4-21;

Mot. Ex. R at 9 (ECF Nos. 94-19 (public version) & 95-21 (sealed version))

(Scrutinizer blog post describing its security analysis capabilities).

The "core functionality" of Plixer's product is analyzing data, not

developing code.  Bilodeau Decl. ¶ 17.  Plixer's Scrutinizer was created to provide

network monitoring (analyzing the information transmitted over a network) and

anomaly detection (searching for problems on the network).  Bilodeau Dep., Mot.

Ex. A, at 11:18-12:25.  Plixer expanded the product in 2011 to detect potential

security threats to a network.  Bilodeau Decl. ¶ 15.  At the time, Plixer described

its Scrutinizer product as "delivering security and network intelligence."  Opp'n

Ex. XVI at 6 (ECF No. 106-17) (press release).

Plixer has also shown—sufficiently at least for summary judgment—that

its product can be used by developers (people who write code) to analyze

computer code.[7]  Although Plixer cannot point to any effort to market its product

this way to developers, Bilodeau Dep., Mot. Ex. A, at 100:1-101:1, it says that

developers can use it to analyze whether their code is producing the kind of

output that they intended, and the software may be able to help improve that

---

[7] Plixer also offers a tool called IPFIXify that is more specifically geared toward text or code
analysis.  See Bilodeau Decl. ¶ 20.  It is not clear how, if at all, IPFIXify is related to the
Scrutinizer product, so I do not consider its functionality here.

code, Bilodeau Dep., Segal Decl. Ex. 1, at 25:13-27:25.  It is unclear from the record how much use developers would have for Plixer's product "out of the box," as opposed to the developer having to write code for it before it can do what the developer needs.  See id. at 27:12-25.

Plixer's focus on network and security functions, while including some development functions, is reflected in its user base.  The "majority" of its Scrutinizer users are personnel involved in network operations, while 30 to 40 percent are involved in security.  Bilodeau Dep., Mot. Ex. A, at 31:25-32:6; Bilodeau Dep., Segal Decl. Ex. 1, at 21:6-11.  Only "a small percentage" of users are developers.  Bilodeau Dep., Mot. Ex. A, at 32:5-6.  Developers, meanwhile, constitute all of the defendant's users.  Schmitt Dep. at 89:19-90:15.

As for pricing, Plixer's prices are based, in general, on the number of connected devices the customer has, as well as data volume and other factors.  Bilodeau Decl. ¶ 25.  Prices are in dollars and customers pay on an annual basis.  Id. ¶ 26.[8]  The defendant, by contrast, prices its Scrutinizer product in euros and charges by the month.  Mot. Ex. S (ECF Nos. 94-20 (public version) & 95-22 (sealed version)) (Scrutinizer pricing table).  Annualized, the defendant's lowest price is below Plixer's.  Compare id. with Bilodeau Decl. ¶ 26.

Although their pricing differs, I conclude that a factfinder could determine that the parties' products are sufficiently similar, based on their overlapping functionality, to support a conclusion that there is a likelihood of confusion.

---

[8] The actual price for Plixer's product is sealed because it is "sensitive, non-public, commercial information."  Pl.'s Mot. to Seal at 4 (ECF No. 107); Order Granting Mot. to Seal (ECF No. 111).

*Similarity of Channels of Trade, Advertising, and Customers*

The next three factors are commonly analyzed together.  See Pignons, 657 F.2d at 488.  "Channels of trade refer to the distribution methods and markets in which the products are sold."  Butcher Co., Inc. v. Bouthot, 124 F.Supp.2d 750, 756-57 (D. Me. 2001).  The parties' distribution methods are the same: they both sell their products on their respective websites.  JSF ¶ 26 (the defendant's product is exclusively available on its website); Pl.'s Resp. to Stmt. of Material Facts ¶ 13 (ECF Nos. 109 (public version) & 105 (sealed version)) (Plixer's product is available for purchase online).  Their markets are also the same.  Both websites are available worldwide and are written in English.  JSF ¶ 27 (the defendant's site is in English); Bilodeau Decl. Ex. XI (ECF No. 106-12) (page from Plixer's website in English).  Though it is based in Germany and sells its product in euros, the defendant made its first sale to a U.S.-based customer in November 2013, soon after it opened for business.  JSF ¶ 25.  Neither company seeks to limit its customers to any one industry, country, or region.  See Pl.'s Answers to Interrogs., Segal Decl. Ex. 6, at 5 (ECF Nos. 106-24 (public version) & 107-6 (sealed version)); Def.'s Answers to Interrogs., Segal Decl. Ex. 13, at 8 (ECF Nos. 106-31 (public version) & 107-8 (sealed version)) (stating defendant "has a very diverse customer base" and describing no limitations).

The parties' advertising differs, as the defendant's is much more limited.  Beyond its website, the defendant has a Twitter account and a blog, but as of November 2019, when the defendant prepared its Statement of Material Facts, the most recent post on either its Twitter account or blog was seven months

11

before, in April 2019.  Pl.'s Resp. to Stmt. of Material Facts ¶¶ 45 & 46 (admitting

the dates of defendant's most recent posts).  It does not pay for any advertising

or promotion.  Def.'s Answers to Pl.'s Revised First Interrogs., Mot. Ex. V, at 4

(ECF Nos. 94-23 (public version) & 95-25 (sealed version)).   The plaintiff's

advertising and marketing efforts are much more extensive.  Plixer maintains an

"active" blog and Twitter account.   Bilodeau Decl. ¶¶ 7 & 8.   Plixer buys

advertising online and in trade magazines.  JSF ¶¶ 5 & 6.  It has an internal

marketing department and also hires an outside marketing firm.  Id. ¶ 6.  Plixer

attends a variety of trade shows, where it typically has a booth and has hired

speakers and given away marketing material.  Id. ¶¶ 7-11.  The evidence does

not show that the parties engage in similar advertising.

The parties' potential customers overlap at least to some extent.  The

defendant's include individual freelance developers as well as organizations.

Schmitt Dep. at 89:19-90:15.   Within those organizations, the people who

actually make the purchasing decision are usually "team leaders or chief

technology officers."  JSF ¶ 30.  Those customers are all looking to develop code,

but they are not limited to any particular industry.  Schmitt Dep. at 89:19-90:25.

Plixer says it seeks to sell its product to "businesses, governments, and

organizations in the public or private sector worldwide."   Pl.'s Answers to

Interrogs. at 5.[9] The people within those organizations who make the purchasing

decision are typically "directors, vice presidents, and chief technology officers."

---

[9] Plixer says its users, discussed above, are not always the same as its customers—in other words, the person within an organization who decides to purchase Plixer's Scrutinizer is not always the person who actually uses it.  Bilodeau Dep., Segal Decl. Ex. 1, at 102:22-103:7.

Bilodeau Decl. ¶ 27.  Thus, at a minimum, both parties sell to chief technology officers.

In general, there is less likelihood of confusion between products when they are expensive and purchased by sophisticated consumers or after careful consideration.  Pignons, 657 F.2d at 489; see also Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1206 (1st Cir. 1983) ("[T]here is always less likelihood of confusion where goods are expensive and purchased after careful consideration.").  Here, those factors do not generate a clear conclusion.  Considering that many of the customers are organizations, a factfinder could find that the pricing is not particularly expensive.  The customers are sophisticated, as most, if not all, are information technology professionals.  There is no evidence about how much care goes into customers' software purchasing decisions.

A factfinder could reasonably conclude that the parties' channels of trade and customers overlap and support finding a likelihood of confusion, although their advertising differs.

### The Defendant's Intent

Under this factor, the question is whether the defendant "decided to use the mark . . . in order to cause market confusion or with an intent to exploit [the plaintiff's] reputation and goodwill."  Dorpan, S.L. v. Hotel Melia, Inc., 728 F.3d 55, 68 (1st Cir. 2013).  This factor only affects the overall analysis if there is evidence the defendant acted in bad faith.  A lack of bad faith "is not particularly

useful in the ultimate determination of likelihood of confusion and may not outweigh other factors that suggest a likelihood of confusion." Id. at 69.

The defendant selected the Scrutinizer name "sometime in 2012," JSF ¶ 31, approximately seven years after Plixer began using it.  The defendant's founder conducted research to determine whether the name Scrutinizer was taken, searching on Google, the World Intellectual Property Organization, and the European Union intellectual property database.[10]  Schmitt Dep. at 20:4-21:16.  He recalls finding nothing about Plixer's Scrutinizer.  Id. at 25:12-15.  Plixer suggests it is hard to believe he conducted such a search without finding its product since, by 2012, it "had published numerous blog posts and press releases on the Internet concerning its Scrutinizer service."  Opp'n at 26; Bilodeau Decl. ¶ 7 (Plixer's blog has existed at least since 2009).  Regardless, Plixer offers no evidence to show the defendant chose Scrutinizer "in order to cause market confusion or with an intent to exploit [Plixer's] reputation and goodwill."  Dorpan, 728 F.3d at 68.  And the defendant offers a plausible and innocent explanation for choosing the name: "[T]he German translation of 'Scrutinizer' is to examine.  And that's exactly what we do, is to examine the source code."  Schmitt Dep. at 19:2-5.

I conclude the evidence does not show the defendant acted in bad faith in selecting the name Scrutinizer.

---

[10] He does not remember searching the United States Patent and Trademark Office database, Schmitt Dep. at 21:22-25, but Plixer's Scrutinizer was not registered until 2017 anyway, JSF ¶ 4.

***Strength of the Marks***

The court will "typically evaluate a mark's strength primarily on the basis of its commercial strength, analyzing such factors as the length of time a mark has been used and the relative renown in its field; the strength of the mark in plaintiff's field of business; and the plaintiff's action in promoting the mark." Dorpan, 728 F.3d at 68 (quoting Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 16 n.14 (1st Cir. 2008)).[11]

Here, Plixer has used the Scrutinizer name continuously since 2005. JSF ¶ 1. It has invested a substantial amount promoting the mark. Bilodeau Decl. ¶ 12. As explained above, Plixer employs both an internal marketing department and an external marketing firm to promote its product. JSF ¶ 6. It advertises online and in print, and it regularly attends trade shows. Id. ¶¶ 5-11. The Scrutinizer mark has apparently become well known among Plixer's customers; the company says its customer service employees use Scrutinizer to refer to the entire company, rather than just the software, because the Scrutinizer term is more familiar. Bilodeau Decl. ¶ 11. A factfinder could reasonably conclude that Plixer's Scrutinizer is a strong mark.

***Actual Confusion***

I end with evidence of actual confusion, a factor that can be "near-determinative" in some cases. Butcher Co., Inc. v. Bouthot, 124 F.Supp.2d 750, 759 (D. Me. 2001). A lack of evidence, after the marks have shared the same

---

[11] In determining the strength of the mark, I consider those factors laid out in Dorpan. I do not find it relevant that Plixer registered the mark in 2017, JSF ¶ 4, or was previously blocked from registering it because of a senior application, Mot. Ex. E (ECF No. 94-6) (application suspension notice).

market for a substantial period, leads to "a strong presumption that there is little likelihood of confusion." Pignons, 657 F.2d at 490. However, actual confusion "is not invariably necessary to prove likelihood of confusion." Id. "While evidence of actual confusion is often deemed the best evidence of possible future confusion, proof of actual confusion is not essential to finding likelihood of confusion." Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 120 (1st Cir. 2006).

Plixer is not aware of any evidence of actual confusion in the United States. JSF ¶ 14. Instead, it cites one instance of confusion in Europe, which was quickly resolved. One of Plixer's resellers, based in Italy, reported that a prospective customer searched for Plixer's Scrutinizer on Google, saw the defendant's website as the third search result, and was temporarily confused until calling the reseller, who resolved the confusion. Id. ¶¶ 15-18. Plixer has no evidence that it lost revenue or sales due to the defendant's use of the term Scrutinizer, and it knows of no customer who bought the defendant's software intending to buy Plixer's, or vice versa. Id. ¶¶ 19 & 20. The defendant is similarly aware of no customers mistakenly contacting or purchasing from one company when they intended the other. Schmitt Dep., Ex. N, at 143:3-23.[12]

---

[12] Plixer argues that even though the defendant began selling in the United States in 2013, its U.S. sales did not become "sufficient enough to reasonably expect potential confusion" until 2016 or 2017—a fact Plixer thinks should temper the negative inference the court might otherwise reach by seeing only one instance of confusion. Opp'n at 25; see Pignons, 657 F.2d at 490-91 (one "feeble" example of actual confusion over a four-year period "strongly indicates" the parties' marks did not create a likelihood of confusion). Because I conclude the other Pignons factors are sufficient to pull the plaintiff through summary judgment without evidence of actual confusion, I do not consider what effect this timing may have.

16

The fact that Plixer can point to only one instance of confusion, which was quickly cleared up and did not cost it any sales, does little to support a finding of likelihood of confusion.  Even so, "proof of actual confusion is not essential to finding likelihood of confusion," Bos. Duck Tours, 531 F.3d at 25, and the lack of actual confusion is not enough to warrant summary judgment in this case.

## CONCLUSION

After "tak[ing] as true the facts documented in the record" and "resolving any factual conflicts or disparities in favor of the nonmovant," Colt Def. LLC v. Bushmaster Firearms, Inc., 486 F.3d 701, 705 (1st Cir. 2007), I conclude—although it is very close—that a factfinder could reasonably find likelihood of confusion.  The parties use the same mark, Scrutinizer.  See Dorpan, 728 F.3d at 69 (even without evidence of actual confusion, and even where the parties—unlike in this case—operate in different industries, courts "have found that a likelihood of confusion exists when companies use identical marks").  Plixer's Scrutinizer is a strong mark.  The products are similar because they are both software for I.T. professionals whose functionality somewhat overlaps.  Their pricing differs, most notably because they sell in different currencies, but their lowest-level prices are not so high that the court could assume customers purchase only after careful consideration.  The parties share the same channels of trade.  The customers are not identical, but they also overlap, as both products are sold to chief technology officers (among others) worldwide, and may be used by developers looking to find errors and improve their code.

17

Other factors point against finding a likelihood of confusion.  The parties' advertising differs, with the defendant conducting no advertising.  The consumers are sophisticated.  There is no evidence that the defendant acted in bad faith in selecting the mark.  There is only weak evidence of actual confusion.  However, these last factors are not enough to outweigh those on the other side of the scale at the summary judgment stage.  See id. at 66 ("No one factor is necessarily determinative, but each must be considered." (quoting Astra Pharm., 718 F.2d at 1205)).

Although the case is close, I conclude that viewing the facts in the light most favorable to Plixer, a reasonable factfinder could conclude there is a likelihood of confusion.  Therefore, I **DENY** the defendant's motion.

**SO ORDERED.**

**DATED THIS 4TH DAY OF MAY, 2020**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

18